UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Pitman Farms,                                              File No. 19-cv-3040 (ECT/BRT)

      Plaintiff/Counter Defendant,

v.

                             **OPINION AND ORDER**

Kuehl Poultry LLC, Rodney Boser,
Dan Schlichting, John Tschida,
Chris Uhlenkamp, and David Welle,

      Defendants/Counter Claimants.

Jeffrey J. Bouslog, Natalie I. Uhlemann, and Archana Nath, Fox Rothschild LLP, Minneapolis, MN; Asher Shepley Anderson, Baker, Manock & Jensen, PC, Fresno, CA, for Plaintiff/Counter Defendant Pitman Farms.

Jack Y. Perry and Maren M. Forde, Taft Stettinius & Hollister LLP, Minneapolis, MN, for Defendants/Counter Claimants Kuehl Poultry LLC, Rodney Boser, Dan Schlichting, John Tschida, Chris Uhlenkamp, and David Welle.

Minnesota statutes and a rule promulgated by the Minnesota Department of Agriculture establish parent-company liability for a subsidiary's unmet obligations under specific kinds of agricultural contracts. Minn. Stat. § 17.93, subd. 2; Minn. Stat. § 27.133; Minn. R. 1572.0040. In other words, when they apply, these authorities override the general rule that a parent corporation is not liable merely by virtue of its status as a parent for the debts of its subsidiary.

The primary issue in this case is whether these authorities apply to chicken-production contracts between Defendants, who are Minnesota chicken growers (and who

will be referred to collectively as "the Growers"), and Simply Essentials, LLC, a chicken processor. If these authorities govern the Growers' contracts with Simply Essentials, then Plaintiff Pitman Farms, a California corporation that is Simply Essentials' sole member, is liable to the Growers for Simply Essentials' breaches of the contracts.

Pitman Farms brought this case under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaration that the Minnesota agricultural "parent-liability" statutes and rule do not govern the Growers' contracts with Simply Essentials. Pitman Farms argues that the parent-liability authorities do not apply by their own terms, that Delaware law applies regardless, and that applying the Minnesota parent-liability authorities to trigger its liability to the Growers would violate the federal dormant Commerce Clause doctrine. In a counterclaim also brought under the Declaratory Judgment Act, the Growers seek essentially contrary declarations and damages.

The Parties have filed cross-motions seeking summary judgment on their respective declaratory-judgment claims. Pitman Farms also has filed a motion to exclude the Growers' expert declaration of Daniel S. Kleinberger, Professor Emeritus at Mitchell Hamline School of Law. Pitman Farms' motion to exclude Professor Kleinberger's declaration will be granted because the Growers' reliance on the testimony is procedurally improper and because, as the Growers themselves describe it, the declaration offers only impermissible legal opinions. Pitman Farms' summary-judgment motion will be granted, and the Growers' cross-motion denied, because the Minnesota parent-liability authorities by their own terms do not apply to the Growers' contracts with Simply Essentials.

I

The relevant facts are undisputed.  The Growers grow chickens and provide them to processing plants.  *See* Am. Compl. ¶ 15 [ECF No. 34].  In 2017, the Growers entered into "broiler production agreements" with Prairie's Best Farms, Inc., a Minnesota chicken processor.  Nath Decl., Exs. A1–A7 [ECF No. 60-1].  Pitman Farms was not a party to the broiler production agreements.  *See id.*  On November 10, 2017, Simply Essentials purchased the assets of Prairie's Best and assumed the broiler production agreements.  *Id.*, Ex. B [ECF No. 60-2].  Simply Essentials is a limited liability company organized under Delaware law and maintains its headquarters in California.  Pitman Decl. in Opp'n ¶ 3 [ECF No. 67].  Pitman Farms was not a party to the asset purchase agreement between Simply Essentials and Prairie's Best.  *See* Nath Decl., Ex. B.

Three days after the asset purchase agreement was executed, Pitman Farms became the sole member of Simply Essentials.  Pitman Decl. in Supp. ¶ 2 [ECF No. 59].  "Pitman Farms' purchase of Simply Essentials['] membership interests occurred in Iowa," and "the agreement transferring Simply Essentials['] membership interests to Pitman Farms . . . is governed by Delaware law."  *Id.*  "Pitman Farms' officers and directors direct, control, and coordinate the activities of Simply Essentials [] on behalf of Pitman Farms in its capacity as the sole member" from Pitman Farms' California headquarters.  Pitman Decl. in Opp'n ¶ 4.  In January 2018, Pitman Farms registered to do business in Minnesota "to allow for the completion of payroll related to" an employee working remotely there.  Pitman Decl. in Supp. ¶ 3, Ex. A [ECF No. 59-1].

The Growers allege that Simply Essentials "began materially breaching its obligations" under the broiler production agreements "nearly as soon as it assumed" them. Mem. Supp. Mot. to Dismiss at 5 [ECF No. 17].   In 2019, Simply Essentials ceased operating due to financial difficulties.[1]   *See* Nath Decl., Ex. C [ECF No. 60-3].   On June 7, 2019, Simply Essentials notified the Growers in writing that it would terminate the broiler production agreements effective September 5, 2019.   *See, e.g.*, *id.*, Ex. D [ECF No. 60-4]. Following termination, the Growers sent notices of default to Simply Essentials, addressed to David Pitman, the Secretary of Pitman Farms.   *Id.*, Ex. E [ECF No. 60-5]; Pitman Decl. in Supp. ¶ 1.   The Growers estimate that they are collectively owed more than $6 million as a result of Simply Essentials' alleged breaches of its obligations under the broiler production agreements.   Mem. Supp. Mot. to Dismiss at 6.

On December 5, 2019, Pitman Farms commenced this action.   Compl. [ECF No. 1]. That same day—after Pitman Farms filed this case—the Growers filed a complaint in Minnesota state district court, Morrison County, asserting breach-of-contract claims against Pitman Farms, Prairie's Best, and Simply Essentials.   Tschida Decl., Ex. A [ECF No. 52-1 at 2–59].   Pitman Farms and Simply Essentials filed motions in the state-court action to stay that case pending resolution of this case.   ECF Nos. 18-9, 18-11, 29-1 at 1–21.   The Growers then filed a motion in the state-court action for partial summary judgment against Simply Essentials and Pitman Farms, including on the issue of whether

---

[1]      Simply Essentials is now insolvent, and on March 6, 2020, an involuntary bankruptcy action was filed against Simply Essentials.   *See* Nath Decl., Ex. C [ECF No. 60-3]; ECF No. 29-1 at 199–205.

Pitman Farms is liable under Minnesota law for Simply Essentials' alleged breaches.  ECF No. 29-1 at 110–130.  On March 19, 2020, the Morrison County District Court ordered that case stayed "until the related federal court declaratory judgment action is resolved, or until further Order of this Court."  Order Granting Motion to Stay Pending Resolution of Federal Court Action ¶ 2, *Boser v. Prairie's Best Farms, Inc.*, No. 49-cv-19-1751 (Morrison Cnty., Minn.).  The Growers then moved to dismiss this action for lack of subject-matter jurisdiction and for failure to join a required party under Federal Rule of Civil Procedure 19.  ECF Nos. 15, 35.  Alternatively, they argued that the case should not move forward in deference to their state-court suit.  *Id.*  The Growers' motions were denied.  ECF No. 37. The Growers subsequently filed their answer and counterclaim.  ECF No. 40.

II

It makes sense to start with Pitman Farms' motion to exclude Professor Kleinberger's declaration because a decision on the motion will determine the record on which the summary-judgment motions will be adjudicated.  Pitman Farms advances two arguments in support of its motion: first, that the Growers failed to disclose Professor Kleinberger in compliance with Fed. R. Civ. P. 26(a)(2), and that exclusion is the appropriate remedy under Fed. R. Civ. P. 37(c); and second, that the testimony should be excluded under the general rule that expert witnesses are forbidden from offering opinions that are legal arguments and conclusions.  *See generally* Pl.'s Mem. Supp. Mot. to Exclude [ECF No. 76].

A

The Growers' reliance on Professor Kleinberger violates Rule 26(a)(2) because it contradicts the pretrial scheduling order.  ECF No. 47.  Under Rule 26(a)(2)(D), expert disclosures must be made "at the times and in the sequence that the court orders."  Here, that did not happen.  The pretrial scheduling order "incorporates a schedule for early cross-motions for summary judgment . . . *because the parties represent[ed] that they do not require any fact discovery to support their [motions.]*"  Pretrial Sched. Order at 4 (emphasis added); *see also id.* at 1 ("Counsel also explained why they jointly believed that the early cross-motions contemplated would likely resolve the case.").  Consistent with the Parties' representations, the pretrial scheduling order repeatedly makes plain that discovery would occur only if—and then only after—a decision on the summary-judgment motions left the case or some part of it unresolved.  *Id.* at 2 ("The Court engaged counsel in a discussion about the need to include a pretrial schedule that addressed all Rule 16 scheduling requirements in the event the early cross-motions for summary judgment did not resolve the case in its entirety."); 3 ("The parties agreed to immediately discuss the scope of discovery to ensure that relevant information is preserved if any fact discovery is sought following the court's decision on the early cross-motions for summary judgment."); 5–7 (establishing disclosure and discovery deadlines based on the date of a decision on the summary-judgment motions).  Even then, Pitman Farms and the Growers made clear that they "d[id] not anticipate calling any expert witnesses" at all, but that if something changed, then each would notify the other of the need for expert discovery *after* the summary-judgment decision.  *Id.* at 6.  In other words, based on the Parties' representations, the

pretrial scheduling order permits discovery only after a decision on the summary-judgment motions. The Growers' filing of an expert declaration with their opposition brief is at odds with this timing and sequence and, therefore, violates Rule 26(a)(2)(D).

Separately, the Growers' reliance on Professor Kleinberger violates Rule 26(a)(2) because the Growers gave no advance disclosure of Professor Kleinberger's testimony. Rule 26(a)(2) is understood to require the disclosure of expert testimony sufficiently in advance of its use so that an opposing party may cross examine the witness or perhaps arrange for its own expert witness. *See Smith v. Tenet Healthsystem SL, Inc.*, 436 F.3d 879, 889 (8th Cir. 2006) (quoting Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment). Here, the Growers filed Professor Kleinberger's declaration with their opposition brief. Under the briefing schedule established in the pretrial scheduling order, Order at 4, that left Pitman Farms with no feasible opportunity to cross-examine Professor Kleinberger or disclose its own expert without seriously disrupting the summary-judgment process proposed by the Parties and adopted in the scheduling order.

The Growers point out that the pretrial scheduling order does not explicitly forbid the submission of expert testimony with, or in opposition to, the summary-judgment motions and that their disclosure of Professor Kleinberger did not occur after the expiration of any deadline. Defs.' Mem. Opp'n Mot. to Exclude at 23 [ECF No. 79]. True enough, but why would the scheduling order explicitly forbid the submission of expert testimony in connection with the summary-judgment motions when the Parties made it so clear that they would not rely on expert testimony in connection with their motions? In view of the Parties' positions and representations, a statement that expert testimony could not be used

to support or oppose the motions, or the establishment of any discovery or disclosure deadlines ahead of a decision on the motions, would have seemed pointless.  The absence of an explicit prohibition or missed deadline, therefore, are not reasons to conclude that the Growers' submission of Professor Kleinberger's declaration did not violate the pretrial scheduling order.  The Growers also argue that, if their disclosure of Professor Kleinberger violated the pretrial scheduling order, then so did Pitman Farms' filing of the factual declaration of its corporate secretary, David Pitman.  *Id.*; *see* ECF No. 59.  Perhaps.  But the Parties never have relied solely on the pleadings to establish the relevant facts, and they have filed no joint statement or stipulation describing the undisputed facts.  Even if they are few and undisputed, the facts have to come from somewhere.  It might also be different if the Growers disputed material parts of Pitman's testimony or suggested that discovery was necessary in response to Pitman's testimony.  They don't.  It also bears mentioning that the Growers seem to have done the same thing by filing, for example, the declaration of John Tschida and the 348 pages of exhibits accompanying it.  ECF No. 52.  Taken to its logical conclusion, wouldn't this argument require the Tschida declaration to be stricken, also?  No sensible reason has been identified to justify excluding declarations filed to identify the (apparently undisputed) material facts.

Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  The Growers have the burden to show that their failure to disclose was substantially justified or harmless.  *Fu v. Owens,* 622 F.3d 880, 883–84 (8th Cir. 2010).

The Eighth Circuit has identified four factors a district court should consider to determine whether a Rule 26(a) violation is justified or harmless: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Rodrick v. Wal-Mart Stores E., L.P.*, 666 F.3d 1093, 1096–97 (8th Cir. 2012) (cleaned up).

Here, the Growers have not shown that their failure was substantially justified or harmless. It is true that trial disruption isn't an issue. The Parties do not believe a trial will be necessary because the facts are undisputed, the issues are purely legal, and the case is ripe for resolution through earlier-than-usual summary-judgment motions. If all that weren't true, the case is a long way from trial. Nor is there any reason to think the Growers acted in bad faith. Still, Pitman Farms' claim of surprise deserves credit in view of the Parties' unqualified representations that they would not require expert testimony or other discovery to support or oppose their summary-judgment motions and in view of the pretrial scheduling order's reliance on these representations in putting off all discovery until after a decision on the summary-judgment motions. The better conclusion is that Pitman Farms understandably did not see this coming. Apart from exclusion, Pitman Farms lacks the practical ability to cure prejudice. Delaying the summary-judgment process to give Pitman Farms time to identify and disclose its own expert or to depose Professor Kleinberger would complicate, delay, and to some extent defeat the purpose of the early summary-judgment motion process the Parties represented was feasible. On balance, then, these

considerations favor excluding Professor Kleinberger's declaration from consideration under Rule 37(c)(1).

B

Professor Kleinberger's declaration also will be excluded because, as the Growers themselves describe the declaration, it offers legal opinions. Expert testimony regarding legal matters is inadmissible. *See S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003); *Williams v. Wal-Mart Stores, Inc.*, 922 F.2d 1357, 1360 (8th Cir. 1990). This rule follows necessarily from Federal Rule of Evidence 702. It permits expert testimony if, among other things, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702(a). In other words, experts testify to aid the fact finder in understanding or determining the facts; as a general rule, they do not testify to aid the fact finder in understanding or determining the law.

Described broadly, Professor Kleinberger offers two opinions in his declaration. His first opinion is that there is no conflict between the Minnesota parent-liability statutes and rule, on the one hand, and the liability shield generally afforded members of a limited liability company. Kleinberger Decl. at 9–13 [ECF No. 71]. His second opinion is that Minnesota's parent-liability statutes and rule apply to subsidiary limited liability companies. *Id.* at 13–15.

The Growers all but admit that these opinions, and other testimony and sub-opinions supporting them, concern legal matters. The Growers acknowledge that Professor Kleinberger's declaration is to a great degree "indistinguishable" from the content of a

10

treatise he co-authored, Carter C. Bishop and Daniel S. Kleinberger, *Limited Liability Companies: Tax and Business Law*. As the Growers explain it: "whether in the Declaration or his treatise, Professor Kleinberger is stating his opinion on the state of the law, and Pitman [Farms] can<u>not</u> seriously argue for the admissibility of his opinions in one format versus another." Defs.' Mem. Opp'n Mot. to Exclude at 15. The Growers then characterize Professor Kleinberger's Declaration as "simply a much narrower, tailor-made version of his prior written opinions [in his treatise] *sans* the prohibited legal advocacy in this forum." *Id.* This is not correct. No doubt lawyers properly may cite treatises for legal propositions. But the prohibition on expert testimony regarding legal matters would accomplish nothing if the authors of those treatises were allowed to testify as experts regarding those same legal propositions. Why hire a lawyer to argue a legal point when you can hire an expert to give sworn testimony?

The Growers rely on *Adams v. New England Scaffolding, Inc.*, No. 13-cv-12629-FDS, 2015 WL 9412518, at *5 (D. Mass. Dec. 22, 2015), for the proposition that "there is no blanket prohibition on expert testimony concerning the law." Defs.' Mem. Opp'n Mot. to Exclude at 16. True enough. As the court acknowledged in *Adams*, a description of the law is sometimes necessary to put an expert's factual testimony in context. *Id.* at *5. However, the court in *Adams* also acknowledged that "such testimony is routinely admitted without objection—and often without anyone even noticing that the testimony includes legal conclusions—[because] the relevant law is not in dispute." *Id.* at *6. That is not true here; the Parties' summary-judgment motions reflect only a dispute about the law. The court in *Adams* also noted that "one of the most important limitations

11

on expert testimony concerning the law is that such testimony has to accurately state the law. An expert cannot simply opine as to his or her view of a disputed point of law, and competing experts cannot offer competing legal opinions." *Id.* at *6. But that is what the Growers seek to do. The bottom line is that the circumstances justifying the admission of law-referencing expert testimony described in *Adams* and cases like it do not exist here.[2]

### III

That brings us to the Parties' cross-motions for summary judgment and the familiar rules governing their adjudication. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Courts take a slightly modified approach where, as here, there are cross-motions for summary judgment. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). When considering Pitman Farms' motion, the record must be viewed in the light most favorable

---

[2]    Professor Kleinberger possesses exceptional qualifications and a well-deserved reputation as a preeminent scholar and educator. The exclusion of his declaration here results from the Growers' procedural infractions and their acknowledged reliance on it as a source of legal opinions and legal authority. Professor Kleinberger cannot be faulted for that.

to the Growers, and when considering the Growers' motion, the record must be viewed in the light most favorable to Pitman Farms. *See id.*

A

It makes practical sense to start by determining whether Minnesota's parent-liability statutes and rule by their own terms govern the Growers' contracts with Simply Essentials. If these statutes do not by their own terms apply, then it would be unnecessary to consider Pitman Farms' arguments that Delaware law should apply instead or that applying the statutes to trigger Pitman Farms' liability to the Growers would violate the federal dormant Commerce Clause doctrine. The statutes and rule are the sole basis for the Growers' claims that Pitman Farms is liable for the amounts Simply Essentials has not paid.

The Parties' claims concern three provisions: Minn. Stat. § 17.93, Minn. R. 1572.0040, and Minn. Stat. § 27.133. Section 17.93, which is entitled "**PARENT COMPANY RESPONSIBILITY FOR CONTRACTS OF SUBSIDIARIES,**" provides, in relevant part:

> Subd. 2. Parent company liability. If an agricultural contractor is the subsidiary of another corporation, partnership, or association, the parent corporation, partnership, or association is liable to a seller for the amount of any unpaid claim or contract performance claim if the contractor fails to pay or perform according to the terms of the contract.

Minn. Stat § 17.93, subd. 2. Exercising authority conferred by Minn. Stat. § 17.945 to "adopt rules to implement sections 17.90 to 17.98," the Commissioner of the Minnesota Department of Agriculture promulgated Minnesota Rule 1572.0040. Entitled "**PARENT COMPANY LIABILITY,**" it provides:

> A corporation, partnership, sole proprietorship, or association that through ownership of capital stock, cumulative voting rights, voting trust agreements, or any other plan, agreement, or device, owns more than 50 percent of the common or preferred stock entitled to vote for directors of a subsidiary corporation or provides more than 50 percent of the management or control of a subsidiary is liable to a seller of agricultural commodities for any unpaid claim or contract performance claim of that subsidiary.

Minn. R. 1572.0040.   Finally, there is Minn. Stat. § 27.133, entitled "**PARENT COMPANY LIABILITY**."  It provides:

> If a wholesale produce dealer is a subsidiary of another corporation, partnership, or association, the parent corporation, partnership, or association is liable to a seller for the amount of any unpaid claim or contract performance claim if the wholesale produce dealer fails to pay or perform according to the terms of the contract and this chapter.

Minn. Stat. § 27.133.[3]

---

[3]     Several months after Pitman Farms commenced this action, and several months before the Parties filed their summary-judgment motions, the Minnesota legislature amended section 27.133, replacing the term "wholesale produce dealer" with "farm products dealer."  *See* 2020 Minn. Sess. Law Serv. Ch. 89 (H.F. 4285), art. 1 § 14.  The amendments, which were approved by the Governor on May 16, 2020, took effect on August 1, 2020.  Minn. Stat. § 645.02.  Although the Parties do not address the issue in their briefing, the prior version of section 27.133 still applies.  To apply the amendments to this case would be to apply them retroactively.  *See In re Petition for Instructions to Construe Basic Resol. 876 of Port Auth. of City of St. Paul*, 772 N.W.2d 488, 494 (Minn. 2009) ("A 'retroactive law' is one that 'looks backward or contemplates the past, affecting acts or facts that existed before the act came into effect.'" (quoting *Black's Law Dictionary* 1343 (8th ed. 2004)).  Under Minnesota law, statutes do not apply retroactively "unless clearly and manifestly so intended by the legislature."  Minn. Stat. § 645.21.  Nothing in the text of the amendments to section 27.133 suggests such an intention.  *See, e.g.*, *K.E. v. Hoffman*, 452 N.W.2d 509, 512 (Minn. Ct. App. 1990) ("[L]anguage applying a statute to 'all cases pending' and establishing an immediate effective date overcomes the presumption against retroactive application.").

B

Pitman Farms says that these authorities do not by their own terms establish its liability for Simply Essentials' debts under the contracts with the Growers, and it advances two arguments to support this position. It first argues that section 17.93 and Rule 1572.0040 apply only when the disputed liability is to a "seller," and the Growers are not, in Pitman Farms' view, "sellers." Pl.'s Mem. Supp. Summ. J. at 30–32 [ECF No. 58]; Pl.'s Mem. Opp'n Summ. J. at 23–25 [ECF No. 66]. Second, Pitman Farms argues that the parent-liability authorities do not apply when the debtor subsidiary is a limited liability company. Pl.'s Mem. Supp. Summ. J. at 16–23; Pl's Mem. Opp'n Summ. J. at 14–17.[4]

These arguments must be considered under Minnesota's statutory-interpretation framework. This is a diversity case under 28 U.S.C. § 1332, ECF No. 37 at 6, so "state law governs substantive issues." *Paine v. Jefferson Nat'l Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010) (citation omitted); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Under Minnesota law, the object of statutory interpretation "is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16. "If the language of a statute is plain and unambiguous, it is presumed to manifest legislative intent and we must give it effect." *State v. Campbell*, 814 N.W.2d 1, 4 (Minn. 2012). Statutory construction is necessary only

---

[4]    As an alternative to their motion to dismiss under Federal Rule of Civil Procedure 19, the Growers argued that abstention was appropriate under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). *See* ECF No. 17 at 25–26 and ECF No. 28 at 5–6. Though certification of questions of law to the Minnesota Supreme Court is available here, Minn. Stat. § 480.065, subd. 3, and though certification offers advantages over *Pullman* abstention, *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974), and "today covers territory once dominated by . . . *Pullman* abstention," *Arizonans for Official English v. Arizona*, 520 U.S. 43, 75 (1997), certification was not requested.

if a statute is ambiguous. *Id.* "A statute is ambiguous only if it is subject to more than one reasonable interpretation." *500, LLC v. City of Minneapolis*, 837 N.W.2d 287, 290 (Minn. 2013). A statute may be ambiguous when one of its operative terms is the subject of conflicting dictionary definitions. *State v. Bowen*, 910 N.W.2d 39, 44 (Minn. Ct. App. 2018). If a statute is ambiguous, the intent of the legislature may be ascertained by referring to, among other things:

> (1) the occasion and necessity for the law;
> (2) the circumstances under which it was enacted;
> (3) the mischief to be remedied;
> (4) the object to be attained;
> (5) the former law, if any, including other laws upon the same
>     or similar subjects;
> (6) the consequences of a particular interpretation;
> (7) the contemporaneous legislative history; and
> (8) legislative and administrative interpretations of the statute.

Minn. Stat. § 645.16 (1)–(8); *Christianson v. Henke*, 831 N.W.2d 532, 537 (Minn. 2013).

## C

Start with section 17.93 and its related statutes. Chapter 17 broadly concerns the Minnesota Department of Agriculture, and sections 17.90 to 17.98 concern agricultural contracts.[5] The Parties do not dispute that the Growers are "producers" for purposes of these sections. Under section 17.90, subdivision 4,

> "Producer" means a person who produces or causes to be produced an agricultural commodity in a quantity beyond the person's own family use and:
>
> (1) is able to transfer title to another; or

---

[5]     "AGRICULTURAL CONTRACTS" is the heading that introduces sections 17.90 to 17.98 of the Minnesota Statutes.

> (2) provides management, labor, machinery, facilities, or any other production input for the production of an agricultural commodity.

There is no dispute that the Growers never actually owned the chickens and could not, therefore, "transfer [the chickens'] title to another" under subparagraph (1).  *See* Nath Decl., Exs. A1–A7 at § 3.D.  But there is also no dispute that the Growers "provide[d] management, labor, machinery, [or] facilities . . . for the production of" the chickens within the meaning of subparagraph (2).

Section 17.93, however, does not use the term "producer."  It establishes parent-company liability with respect to contracts between an "agricultural contractor," on the one hand, and a "*seller*" on the other.  Minn. Stat. § 17.93, subd. 2 (emphasis added).  The term "producer" appears many times throughout sections 17.90 to 17.98.  *See* Minn. Stat. §§ 17.91, 17.92, 17.941, 17.942, 17.943, 17.944, 17.9441, 17.97, and 17.98. By contrast, "seller" appears only in section 17.93 and section 17.90, subdivision 1a (where it is merely used to explain that contracts between buyers and "seller[s] of grain" are not included in the definition of "[a]gricultural contract").  No authority or reason has been identified to justify the conclusion that section 17.93's use of "seller" was a mistake.

The term "seller" is not defined in sections 17.90 to 17.98.  Ordinarily, when a word in a statute is not specially defined, a court should "look first to the plain and ordinary meaning of the word."  *White Bear Lake Restoration Ass'n ex rel. State v. Minn. Dep't of Nat. Res.*, 946 N.W.2d 373, 388 (Minn. 2020) (Anderson, J., concurring in part and dissenting in part).  As will be discussed in greater detail shortly, however, the several possible definitions of "seller" mean that its use in section 17.93 generates ambiguity.  Just

as important, however "seller" is defined, it cannot mean the same thing as "producer." In statutory interpretation, "'when different words are used in the same context, we assume that the words have different meanings' so that every word is given effect." *State v. Thompson*, 950 N.W.2d 65, 69 (Minn. 2020) (quoting *Dereje v. State*, 837 N.W.2d 714, 720 (Minn. 2013)). For this reason, the Growers' argument that "seller" must be given the same meaning as "producer," Defs.' Mem. Supp. Summ. J. at 5–7 [ECF No. 51] and Defs.' Mem. Opp'n Summ. J. at 2 n.2 [ECF No. 69], cannot be accepted. The dispositive questions, then, are whether "seller" in section 17.93 has a broader or narrower meaning than "producer," and if narrower, then whether the Growers are nonetheless "sellers."

Rule 1572.0040 clarifies the meaning of "seller" and seems to answer these questions. It limits parent-company liability to contracts between a subsidiary and "a seller of agricultural commodities." Minn. R. 1572.0040. This is narrower than the definition of "producer" for purposes of sections 17.90 to 17.98 because it includes only the transfer-of-title element of that definition from section 17.90, subdivision 4(1) and omits the provision-of-services element described in section 17.90, subdivision 4(2). As noted, it is undisputed that the Growers do not sell agricultural commodities.

Courts ascertaining the Minnesota legislature's intent do "not defer to an agency's interpretation of unambiguous statutes," *In re Reissuance of NPDES/SDS Permit to U.S. Steel Corp.*, 937 N.W.2d 770, 780 (Minn. Ct. App. 2019); *see Marks v. Comm'r of Revenue*, 875 N.W.2d 321, 326–27 (Minn. 2016), but when a statute is ambiguous, courts may consider "administrative interpretations," Minn. Stat. § 645.16(8). The Minnesota Supreme Court has repeatedly said that an agency's interpretation of a statute it administers

18

is "entitled to deference." *Benda v. Girard*, 592 N.W.2d 452, 455 (Minn. 1999) (quoting *George A. Hormel & Co. v. Asper*, 428 N.W.2d 47, 50 (Minn. 1988)); *see also, e.g.*, *In re Excess Surplus Status of Blue Cross and Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn. 2001). The appropriate degree of deference is less clear, and it shifts somewhat depending on the circumstances. As a general rule, courts will defer to an interpretation that is "reasonable" and consistent with the language of the statute, *see A.A.A. v. Minn. Dep't of Human Servs.*, 832 N.W.2d 816, 822–23 (Minn. 2013); *U.S. Steel Corp.*, 937 N.W.2d at 780, whereas deference is not appropriate when the agency's interpretation is inconsistent with the statute or there are "compelling indications that it is wrong," *Buhs v. State, Dep't of Pub. Welfare*, 306 N.W.2d 127, 129 (Minn. 1981) (citation omitted). Heightened deference is warranted when the agency's interpretation is particularly longstanding or the statutory scheme involved is highly technical. *See Marks*, 875 N.W.2d at 327; *In re Excelsior Energy Inc.*, 782 N.W.2d 282, 289 (Minn. Ct. App. 2010); *see also Minn. Ctr. For Env't Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 464 (Minn. 2002) (deferring to an agency's "interpretation of whether [a] statutory standard [was] met" because the inquiry was "primarily factual" and required "application of the agency's technical knowledge and expertise").

Judged against these authorities, Rule 1572.0040 deserves heightened deference when it comes to interpreting section 17.93. "Seller" is ambiguous. It may refer to "[s]omeone who sells or contracts to sell goods" or "the transferor of property in a contract of sale." *Black's Law Dictionary* 1634 (11th ed. 2019). It also may refer to a person who sells services. *See* Sell and Seller, *The American Heritage Dictionary of the English*

*Language* 1639 (3d ed. 1992).  The rule reflects a reasonable understanding of, and is consistent with, the statute.  It differentiates "seller" from "producer."  Adopting a broad definition of "seller" that would include the sale of both commodities and services would give "seller" a meaning that very closely resembles, if not matches, the definition of "producer" in section 17.90, subdivision 4.  The rule's narrower definition also dovetails with the statute's definition of "[c]ontractor" (an entity with whom "seller[s]" contract) as one who "buys agricultural commodities."  Minn. Stat. § 17.90, subd. 3.[6]  Although the statutory and regulatory scheme—which involves the liability of certain corporate entities—is not especially technical or unfamiliar to courts, the Department of Agriculture's interpretation is longstanding.  The agency promulgated the rule nearly thirty years ago, *see* 15 Minn. Reg. 1285, 1924 (Mar. 4, 1991), and it does not appear that the rule has been challenged or otherwise litigated in the years since.  At the very least, there are no "compelling indications" that the agency's interpretation is wrong.  *Buhs*, 306 N.W.2d at 129 (citation omitted).  In view of the heightened deference owed Rule 1572.0040 and the good reasons for interpreting section 17.93 to share the rule's reach, neither section 17.93 nor the rule govern the Growers' contracts with Simply Essentials.

---

[6]    The full definition of "contractor" is one who either (a) "buys agricultural commodities grown or raised in [Minnesota]," or (b) "contracts with a producer to grow or raise agricultural commodities in [Minnesota]."  Minn. Stat. § 17.90, subd. 3.  Though a "producer" by definition may sell agricultural commodities, *id.*, subd. 4(1), it is noteworthy that the definition of "contractor" does not use the term "producer" to describe this activity. It limits use of the term "producer" to describe one who "grow[s] or raise[s] agricultural commodities."  *Id.*, subd. 3.  Defining "seller" as one who engages only in the sale of commodities is thus consistent with the full definition of "contractor."

D

Now turn to Minn. Stat. § 27.133.[7]  It appears in a chapter concerning wholesale produce dealers.  It establishes parent-company liability with respect to contracts between "wholesale produce dealer[s]," on the one hand, and "seller[s]" on the other.  *Id.*  For purposes of section 27.133, a "[w]holesale produce dealer" includes "a person who buys from or contracts with a seller for production or sale of produce in wholesale lots for resale[.]"  *Id.* § 27.01, subd. 8(a)(1).  Relevant here, "[p]roduce" includes "poultry and poultry products."  *Id.*, subd. 2(3).  "'Seller' means a farmer or wholesale produce dealer, whether the person is the owner of the produce or produces it for another person who holds title to it."  *Id.*, subd. 10.  The Parties do not dispute that Simply Essentials is a "wholesale produce dealer" and that the Growers are "sellers" for purposes of section 27.133.

1

The statute's use of "another" creates ambiguity.  To recap, under section 27.133, if a wholesale produce dealer "fails to pay or perform according to the terms of [a] contract" with a seller, and "[i]f a wholesale produce dealer is a subsidiary of *another* corporation, partnership, or association, [then] the parent corporation, partnership, or association is liable to [the] seller for the amount of any unpaid claim" under the contract.  (Emphasis added).  Minnesota courts "construe the word 'another' according to its common and approved usage unless it is defined in statute or has acquired a special meaning."  *State v. Stewart*, 624 N.W.2d 585, 589 (Minn. 2001) (citing Minn. Stat. § 645.08(1)).  This

---

[7]     If the Growers were "sellers" for purposes of section 17.93, then the analysis and conclusions in Part D would apply also to section 17.93.

principle often leads courts to consult dictionaries.  *See id.*; *see also Associated Bank, N.A. v. Comm'r of Revenue*, 914 N.W.2d 394, 406 (Minn. 2018).[8]  Ambiguity arises because the definition of "another" has at least two components in tension with each other.  The first is that the "other" must be "[d]istinctly different from the first."  *The American Heritage Dictionary of the English Language* 74 (5th ed. 2011); *accord Webster's Third New International Dictionary* 89 (1976) (defining "another" to mean "one that is different, separate, or in contrast to the first").  But because the word "another" generally implies some connection between the "original" and the "other," it seems that the two must be "of the same kind," at least to a degree.  *Another*, Merriam-Webster, https://www.merriam-webster.com/dictionary/another (last visited Dec. 17, 2020).

The Parties' dispute over the meaning of section 27.133 reflects this ambiguity and definitional tension.  Pitman Farms says section 27.133's use of "another" means the "subsidiary must be one of those three listed entities."  Pl.'s Mem. Supp. Summ. J. at 17.  The Growers, on the other hand, say that "another" means only a different organization from the subsidiary.  Defs.' Mem. Supp. Summ. J. at 26.

---

[8]      Ambiguity owing to a statute's usage of "another" is not uncommon.  *Compare, e.g.*, *United States v. Amri*, No. 1:17-cr-50 (LMB), 2017 WL 3262254, at *11–14 (E.D. Va. July 31, 2017) (holding that the phrase "another person" in an obstruction-of-justice statute, 18 U.S.C. § 1512(b)(3), means a person other than the defendant and the investigating federal officers) *with United States v. Hawkins*, 185 F. Supp. 3d 114, 125–26 (D.D.C. 2016) (finding that the phrase "another person" in the same statute means "'any person'" other than the defendant); *see also United States v. Spears*, 729 F.3d 753, 754–58 (7th Cir. 2013) (finding the phrase "another person" as used in an identity-theft statute, 18 U.S.C. § 1028A, to be ambiguous and interpreting the phrase to mean, not "every person other than the defendant," but "a person whose information has been misappropriated").

Pitman Farms has the better argument in view of the statute's text. Minnesota courts have resolved ambiguity owing to a statute's use of "another" by focusing on surrounding text and related provisions. For example, in *Elsola v. Commissioner of Revenue*, the Minnesota Tax Court confronted a statute that addressed sums that a taxpayer who was a "resident of this state" was liable to pay "to another state or a province or territory of Canada." No. 3980, 1984 WL 2983, at *1 (Minn. Tax Ct. Apr. 9, 1984) (quoting Minn. Stat. § 290.081(c) (1982)). The taxpayers argued that the term "another state" meant a foreign country. *See id.* at *2. The court rejected this argument and held that "another state" referred to "one of the states of the United States other than Minnesota." *Id.* This conclusion was based primarily on a separate tax provision's definition of "this state" as "the state of Minnesota," as well as the disputed provision's reference to a "province or territory of Canada," which invoked "the major subdivisions of Canada" rather than the "Canadian national government." *Id.* Similarly, in *Campbell*, the Minnesota Supreme Court had to decide whether the phrase "another offense," which appeared in a provision of the Minnesota Sentencing Guidelines, referred only to felony offenses or extended to misdemeanors and gross misdemeanors. 814 N.W.2d at 5. Based primarily on the fact that the Guidelines as a whole "apply only to felonies," the court held that "another offense" really meant "another felony offense." *See id.* at 5–6.

With these Minnesota cases in mind, the better conclusion is that the phrase "another corporation, partnership, or association" in section 27.133 means there is some original entity—*i.e.*, the subsidiary—that is also a "corporation, partnership, or association." This interpretation is consistent with the surrounding text and accepts the limiting connection

implied by use of the word "another" alongside the three listed entities in a way that is consistent with the courts' approaches in *Elsola* and *Campbell*.  Accepting the Growers' interpretation would have the effect of reading section 27.133 to require only that the wholesale produce dealer be "a subsidiary of [a] corporation, partnership, or association." In other words, under the Growers' interpretation, "another" is intended merely as an indefinite article and synonym of "a."  That doesn't give the legislature enough credit. Saying that one organization is a "subsidiary" distinguishes it from a different organization. In other words, use of the word "another" merely to differentiate the subsidiary from the parent would duplicate work that "subsidiary" does already.  The word "another" is better understood to imply that both the parent and subsidiary must be drawn from one of the categories listed in section 27.133.

2

From this understanding, Pitman Farms next argues that Simply Essentials is not a "corporation, partnership, or association" because it is a limited liability company. Therefore, the argument goes, section 27.133 neither governs the Growers' contracts with Simply Essentials nor establishes Pitman Farms' parent liability for Simply Essentials' unmet obligations under those contracts.  In their opening brief, the Growers acknowledged that "limited liability companies are not referenced in any of the" parent-liability statutes, including section 27.133.  Defs.' Mem. Supp. Summ. J. at 27.  This is understandable, the Growers acknowledged, because limited liability companies were not authorized in Minnesota until 1992, two years after enactment of the parent-liability statutes.  *Id.*  The Growers argued that section 27.133 should nonetheless be interpreted to apply to limited

liability companies to effectuate the purpose of the parent-liability statutes.  *Id.* at 27–28.
In their opposition brief, the Growers argued that "association" as intended in section
27.133 includes limited liability companies.  Defs.' Mem. Opp'n Summ. J. at 7–8.

Though the question is close and difficult, the better answer is that "association" as
used in section 27.133 does not include limited liability companies.  Four primary
considerations lead to this conclusion: first, that section 27.133 was enacted before the
creation of limited liability companies in Minnesota but has not been amended since;
second, that "association" does not seem intended in section 27.133 as a catch-all for every
form of business organization that might exist; third, that "association" is more commonly
intended to mean something different from a limited liability company when it is used
elsewhere in Minnesota statutes; and fourth, that no Minnesota case answers the question.
It is true that this conclusion appears somewhat at odds with section 27.133's general
purpose, but that general purpose cannot be understood without accounting for textual
limits.

When enacted, section 27.133 could not have used "association" to refer to limited
liability companies because limited liability companies weren't yet a thing under
Minnesota law, and though the Minnesota legislature has since directed that many statutes
be amended to refer to limited liability companies, it has not amended section 27.133 to do
that.  The Minnesota legislature did not adopt the Minnesota Limited Liability Company
Act ("the Act")—which provided for the first formation and recognition of limited liability
companies under Minnesota law—until two years after it enacted the parent-liability

statutes.  *See* 1992 Minn. Laws ch. 517 (H.F. No. 1910).[9]  The Act included provisions directing that many other statutes be amended to include explicit references to limited liability companies, *see id.* art. 1, but neither section 27.133 nor any statutes in the chapters pertaining to agriculture, Minnesota Statutes Chapters 17–43, were among those amended.[10]  Despite the subsequent amendment and inclusion of references to limited liability companies in an even greater number of statutes, section 27.133 has not been amended to include explicit reference to limited liability companies since its enactment.

Of course, section 27.133's amendment would have been unnecessary if "association" were intended originally to refer to any business organization then or ever existing but attributing that expansive meaning to section 27.133 seems implausible.  When the Minnesota legislature intends to bring many kinds of business organizations within a statute's reach, it more commonly uses catch-all words and phrases that do not include "association."  For example, Minnesota statutes frequently define "person" by reference to a list of specific individuals and entities followed by phrases like "and other business organizations" or "and any other legal or commercial entity."  *See, e.g.*, Minn. Stat. §§ 12.03, subd. 7a; 15C.01, subd. 5; 16B.33, subd. 1(i); 52.001, subd. 10; 270C.01, subd.

---

[9]     The Act was originally codified in Chapter 322B of the Minnesota Statutes.  In 2014, the Minnesota Revised Uniform Limited Liability Company Act was enacted and codified in Chapter 322C, at which time Chapter 322B was repealed.  *See* 2014 Minn. Laws ch. 157 (H.F. No. 977).

[10]    The amendments provided for in the Act involved a wide range of statutes, including those related to corporate political contributions, income and excise tax, business corporations, cooperatives, nonprofit corporations, professional corporations, limited partnerships, trade names, and estates in real property.  1992 Minn. Laws ch. 517, art. 1.

6; 302A.011, subd. 22; 611A.68, subd. 1(d).  Other statutes include similar references.  *See,*
*e.g.*, *id.* § 181.970, subd. 2(3) (providing employee indemnification provision does not
apply when covered by other laws "specifically governing indemnification of employees
of business or nonprofit corporations, limited liability companies, or other legal entities");
*id.* §§ 216B.02, subd. 4, 336B.01, subd. 1, and 325E.025, subd. 1 (defining "[p]ublic
utility" and "utility" to mean "persons, corporations, or other legal entities . . ."); *id.*
§ 317A.681, subd. 1(b) (defining "[o]rganizational document" as it pertains to a domestic
or foreign limited liability company, a trust, a domestic or foreign corporation, or "any
other organization").  Significantly, some statutes use "association" and then a separate
catch-all phrase like "other organization" and "other legal entities," meaning that
"association" must have a separate meaning, certainly in those statutes.  *See, e.g.*, *id.*
§ 501B.35, subd. 4 (defining "[t]rustee" as an "agent of an association, foundation, trustee
corporation, corporation, or other legal entity").[11]  When the Minnesota legislature intends
"association" to be a catch-all, it includes the word in a phrase indicating that purpose.  *See,*
*e.g.*, *id.* § 514.67(1) ("'Person' means and includes any natural person in any individual or
representative capacity, and any firm, copartnership, corporation, *or other association of*
*any nature or kind*.") (emphasis added); *id.* § 520.01, subd. 4 ("'Person' includes a

---

[11]    For another example of a statute that takes this approach, *see* Kan. Stat. Ann. § 16-
1501(d) ("If the contractor is the subsidiary of another corporation, partnership, or a
member of another association or other business entity, the parent corporation, partnership,
association or other business entity is liable to a producer for the amount of any unpaid
claim or contract performance claim if the contractor fails to pay or perform according to
the terms of the contract.").  This statute also is distinguishable from section 27.133
because it expressly defines contractor to include limited liability companies.  *Id.* § 16-
1501(a).

corporation, partnership, *or other association*, or two or more persons having a joint or common interest.") (emphasis added); *id.* § 10A.01, subd. 35a (defining "[s]ecurities" as "any stock . . . in any corporation, partnership, trust, *or other association*") (emphasis added); *id.* § 268.065, subd. 1 (defining "contractor" and "subcontractor" to "include individuals, partnerships, firms, or corporations, *or other association* of persons engaged in the construction industry") (emphasis added); *id.* § 317A.161, subd. 13(b) (providing that a corporation "may participate with others in a corporation, partnership, limited partnership, joint venture, trust, *or other association of any kind* . . .") (emphasis added). Section 27.133 includes no like phrasing, suggesting that its mere reference to "association" was not intended as a catch-all.

When the term "association" appears alone and without a specific definition—as it does in section 27.133—the Minnesota legislature more commonly intends it to mean a type of organization different from a limited liability company. "Association" appears as a distinct entity in numerous Minnesota statutes identifying various business organizations. For example, in the 1990 statutes pertaining to business corporations, the term "[o]rganization" is defined as "a domestic or foreign corporation, partnership, limited partnership, joint venture, association, business trust, estate, trust, enterprise, and any other legal or commercial entity." Minn. Stat. § 302A.011, subd. 19 (1990); *see also id.* § 317A.011, subd. 16 (1990). When the Act was enacted in 1992, section 302A.011, subdivision 19, was amended to define "[o]rganization" as "a domestic or foreign corporation, limited liability company, whether domestic or foreign, partnership, limited partnership, joint venture, association, business trust, estate, trust, enterprise, and any other

legal or commercial entity."   Minn. Stat. § 302A.011, subd. 19 (1992);[12] *see also*
*id.* § 317A.011, subd. 16 (1992) (amended in the same way).  Other statutes were amended
at that time in this same way.  *See* Minn. Stat. § 322A.01(11) (1992) (defining "[p]erson"
as "a natural person, partnership, limited partnership (domestic or foreign), trust, estate,
association, limited liability company (whether domestic or foreign), or corporation");
*id.* § 333.18, subd. 2 (1992) (defining "person" as "any individual, firm, partnership,
corporation, limited liability company, whether domestic or foreign, association, union, or
other organization").  In other words, despite the legislature's inclusion of limited liability
companies in these definitions, "association" remained separately among the listed entities,
suggesting an "association" generally is distinct from, and not inclusive of, a limited
liability company.   And Minnesota's limited-liability-company statutes, both at their
enactment and today, distinguish limited liability companies from associations.  *See*
Minn. Stat. § 322B.03, subd. 34 (1992) (defining "[o]rganization" as "a domestic or
foreign limited liability company, corporation, partnership, limited partnership, joint
venture, association, business trust, estate, trust, enterprise, and any other legal or
commercial entity");  *id.* § 322C.0102, subd. 20 (2020) (defining "[p]erson" as "an
individual, corporation, business trust, estate, trust, partnership, limited liability company,
association, joint venture, public corporation, government or governmental subdivision,
agency, or instrumentality, or any other legal or commercial entity");  *see also*

---

[12]      Section 302A.11, subdivision 19, was amended in 2015, at which time "association"
was removed from the statute along with several other listed entities.  "Limited liability
compan[ies]" remained.

*id.* § 322C.0102, subd. 12 (2020) (defining a limited liability company as "an entity" formed under Chapter 322C, not as "an association").  In view of these examples, it makes better sense to understand "association" in section 27.133 not to refer to or include a limited liability company.

The Growers argue that a specialized definition given "association" elsewhere in Minnesota statutes should be attributed to the parent-liability statutes, but that would be inappropriate.  Where "association" is specially defined in Minnesota statutes, its meaning depends very much on context.  For example, in 1990, "association" was defined at least seventeen times in Minnesota statutes (and used more than three hundred times), but only two of those definitions were identical.  Sections 10A.01, subdivision 3, and 383B.042, subdivision 3, defined "[a]ssociation" as a "business, corporation, firm, partnership, committee, labor organization, club, or any other group of two or more persons, which includes more than an immediate family, acting in concert."  Minn. Stat. §§ 10A.01, subd. 3, 383B.042, subd. 3 (1990).[13, 14]  The Growers argue that this definition encompasses

---

[13]     Section 10A.01, subdivision 6, of the 2020 statutes now defines association as "a group of two or more persons, who are not all members of an immediate family, acting in concert."  The definition in section 383B.042, subdivision 3, remains the same.

[14]     This definition references entities "of two or more persons."  Minnesota law did not allow for the formation of single-member limited liability companies until 1997.  *Compare* Minn. Stat. § 322B.11 (1992) (requiring limited liability companies to have two or more members at the time of formation), *with* Minn. Stat. § 322B.11 (1997) (requiring a limited liability company to have one or more members); *see* 1997 Minn. Laws 176.  Although this portion of the definition is not significant to ascertaining the legislature's intent in using the term "association" in 1990, as Minnesota law did not then recognize limited liability companies of any size, it has not been amended since the advent of the single-member limited liability company.

limited liability companies and should be imputed to section 27.133 (and to section 17.93). Defs.' Mem. Opp'n Summ. J. at 8.  It is true that sections 10A.01, subdivision 3, and 383B.042, subdivision 3, were enacted prior to the legislature's inclusion of "association" in the parent-liability statutes.  *See* 1974 Minn. Laws 1149; 1980 Minn. Laws 59. Regardless, sections 10A.01, subdivision 3, and 383B.042, subdivision 3, do not share a common purpose or subject matter with sections 17.93 or 27.133.  *See State v. Thonesavanh*, 904 N.W.2d 432, 437 (Minn. 2017); *see also Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning *in a given context*." (emphasis added)).  Section 10A.01 regulates ethical practices in government, and section 383B.042 is part of a larger statutory regime governing elections in Hennepin County.  It therefore would be inappropriate to attribute this definition of "association" to section 27.133.

No Minnesota case provides a clear answer one way or the other.  The case that comes the closest is *Enbridge Energy, Ltd. Partnership v. Dyrdal*, No. A08-1863, 2009 WL 2226488 (Minn. Ct. App. July 28, 2009).  There, the court addressed a Minnesota statute, Minn. Stat. § 117.48, that authorized "[a]ny corporation or association qualified to do business in the state of Minnesota engaged in or preparing to engage in the business of transporting crude petroleum" to "acquire, for the purpose of such business, easements or rights-of-way" and "enjoy the power of eminent domain."  *Id.* at *3.  The court concluded that "given the context in which association is used in chapter 117, it would be absurd for us to conclude that the legislature intended to exclude certain types of business entities from the powers granted by Minn. Stat. § 117.48."  *Id.*  The court added that "[t]here is no

indication from the text of the statute that the legislature intended to differentiate or exclude businesses that transport crude petroleum based on how they are organized or incorporated." *Id.* *Enbridge* does not warrant the same result here. The context is quite different. *Enbridge* concerned a challenge to a crude oil transporter's ability to acquire a right-of-way easement necessary to installation of a 108-mile underground pipeline. *Id.* at *1. Regardless, the interpretive challenges raised by the Parties here and addressed in this opinion were not addressed in *Enbridge*.[15] Pitman Farms argues that *Minnesota Joint Underwriting Ass'n v. Star Tribune Media Co.*, 862 N.W.2d 62 (Minn. 2015), shows that the Minnesota Supreme Court generally understands "association" not to include or refer to limited liability companies. *See* Pl.'s Suppl. Authority [ECF No. 82]. The case does not support such a broad reading. The issue in *Joint Underwriting Ass'n* was whether an involuntary association of insurers created by Minnesota statutes (the Minnesota Joint Underwriting Association or "MJUA") was a "state agency" subject to the Minnesota Government Data Practices Act. 862 N.W.2d at 63. The court held that the association of insurers was not a state agency:

> MJUA is legally organized as an involuntary association of private insurers. *See* Minn. Stat. § 62I.02, subd. 1. According to the insurance code, an association is an "organized body of

---

[15]    The Growers fairly point out that this interpretation would leave contracting subsidiaries' owners with an opportunity to game the system by reorganizing as limited liability companies. The Growers imply this would be an absurd outcome. However, those opportunities exist regardless. For example, the Minnesota Department of Agriculture does not understand the parent-liability statutes to apply to every corporation, partnership, or association with an ownership interest in a subsidiary—only those that "own[] more than 50 percent" of the voting shares or "provide[] more than 50 percent of the management or control of a subsidiary." Minn. R. 1500.1001, 1572.0040. Thus, it appears that dilution of ownership could already enable parent organizations to avoid parent liability.

> people who have some interest in common." Minn.
> Stat. § 60A.02, subd. 1a (2014). By definition, an
> "association" is not a legal entity separate from the persons
> who compose it. *Black's Law Dictionary* 132 (8th ed. 2014).
> Accordingly, while the MJUA was created by state statute, it
> is not part of the State; it is an organization consisting of private
> insurers.

*Id.* at 66. *Joint Underwriting Ass'n* thus concerned a narrow question different from the issues presented here, and though its statement that "an 'association' is not a legal entity separate from the persons who compose it" may be true generally, it gives little help in ascertaining the intended meaning of "association" in the parent-liability statutes. Finally, in *Krueger v. Zeman Construction Co.*, 781 N.W.2d 858 (Minn. 2010), the court held that a limited liability company "qualifies as a 'person' for purposes of" a provision of the Minnesota Human Rights Act defining "person" to include, among other entities, "a partnership, association, or corporation[.]" *Id.* at 862. But the court reached this conclusion with no discussion, much less any analysis that might inform the disposition of this case. *See id.*

It is true that the legislature described a liberal policy behind section 27.133 and that this interpretation somewhat narrows the statute's reach. Chapter 27 includes the following statement of public policy:

> The legislature recognizes that perishable agricultural products
> are important sources of revenue to a large number of citizens
> of this state engaged in producing, processing, manufacturing,
> or selling such products and that such products cannot be
> repossessed in case of default. It is therefore declared to be the
> policy of the legislature that certain financial protection be
> afforded those who are producers on the farm; farmer
> cooperatives which are not wholesale produce dealers as
> described in section 27.01, subdivision 8; and licensed

> wholesale produce dealers, including the retail merchant purchasing produce directly from farmers. The provisions of this chapter which relate to perishable agricultural commodities shall be liberally construed to achieve these ends and shall be administered and enforced with a view to carrying out the above declaration of policy.

Minn. Stat. § 27.001. Though first enacted in 1969, this statement accurately describes the legislature's motives behind enacting section 27.133. In a nutshell, both section 27.133 (and section 17.93) were enacted following the legislature's creation of, and receipt of reports from a task force recommending economic protections for farmers producing agricultural commodities under contract, including parent-company liability.[16]

---

[16]   In 1988, the Minnesota legislature established the Agricultural Contract Task Force "to determine the feasibility of changing existing programs or developing a new program to provide economic protection for farmers producing agricultural commodities under contract." 1988 Minn. Laws 1265. Such economic protection "would be provided when businesses have filed bankruptcy and are unable to make payments under the contract or are otherwise financially unable to make payments under the contract." *Id.* The task force included "farmers, canning processors, contract seed businesses, livestock and poultry contractors, other agricultural processors, farm organizations, and bonding and financial institutions." *Id.* The task force prepared two reports for the legislature: an interim report in February 1989 and a final report in February 1990. In its reports, the task force identified an increasing trend in contract farming that "was not as prevalent" at the time the Wholesale Producer Dealers Act (Minn. Stat. Ch. 27) and other agricultural legislation was written as well as a lack of uniformity to agricultural contracting in Minnesota. Agricultural Contracts Task Force, *An Interim Report to the 1989 Legislature* 1 (Feb. 1989) ("1989 Report"); Agricultural Contracts Task Force, *Final Report to the 1990 Legislature* 1 (Feb. 1990) ("1990 Report"). It also identified "[m]ajor contract problem areas," including non-payment, problems with interpreting contractual rights and responsibilities, and problems due to unequal bargaining power. *Id.* In the interim report, the task force noted the "[i]nability of producer[s] to determine [the] financial soundness of contractors" and queried whether "parent companies [should] be made responsible for the contracts of its subsidiaries." 1989 Report at 18 (capitalization omitted). In its final recommendations, the task force recommended that "[p]arent companies should be made responsible for the unfulfilled contracts of their subsidiaries." 1990 Report at 3 ¶ 3. This recommendation reflected the task force's "concern that shell, spin off and subsidiary corporations" resulting from "[r]ecent leveraged buyouts and business consolidations might be unable to fulfill

Nonetheless, section 27.133's broad policy statement and purpose cannot trump the limitations created by its text.  When a statute is ambiguous, its purpose is one of many extratextual factors a court "may" consider.  Minn. Stat. § 645.16; *see Marks*, 875 N.W.2d at 326; *Ouradnik v. Ouradnik*, 897 N.W.2d 300, 303–04 (Minn. Ct. App. 2017), *aff'd*, 912 N.W.2d 674 (Minn. 2018).  But "no law pursues its purpose at all costs, and . . . textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations."  *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (plurality opinion).  Although the conclusion that limited liability companies do not fall within the scope of Minn. Stat. § 27.133 is arguably inconsistent with that provision's purpose, the statutory text, context, and composition in view of other statutes carry greater weight in this case.  Put another way, had the legislature intended section 27.133 to have the broadest possible reach implied by its legislative history and section 27.001's policy statement, it would have identified no limits on the type of business organizations susceptible to parent liability.  That didn't happen, and the limits identified in section 27.133 cannot be disregarded.[17]

_____

contracts with producers because of bankruptcy or insufficient assets."  *Id.* at 11 ¶ 13.  The Minnesota legislature subsequently enacted two bills based on the task force's recommendations—1990 Minn. Laws ch. 517 (S.F. No. 1779) and 1990 Minn. Laws ch. 530 (S.F. No. 2037).  The preamble of the former stated, among other things, that it was an act "clarifying responsibility of parent companies for affiliates."  1990 Minn. Laws 1319 (codified at Minn. Stat. §§ 17.90–.98 and 514.945).  Likewise, the latter listed "providing parent company liability" among its purposes.  1990 Minn. Laws 1375.  The provisions concerning parent company liability were codified at sections 17.93 and 27.133 of the Minnesota Statutes.  See 1990 Minn. Laws 1320–21, 1382.

[17]     The Growers argue that section 27.133's title, "Parent Company Liability," shows the legislature intended to include limited liability companies within its reach.  A statute's

\*

The determination that the parent-liability statutes do not by their own terms govern the Growers' contracts with Simply Essentials makes it unnecessary to consider the choice-of-law issues raised by the Parties or Pitman Farms' argument under the dormant Commerce Clause doctrine.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Plaintiff's Motion to Exclude the August 24, 2020 Kleinberger Declaration [ECF No. 74] is **GRANTED**.

2.      Plaintiff's Motion for Summary Judgment [ECF No. 56] is **GRANTED**.

3.      Defendants' Motion for Summary Judgment [ECF No. 49] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  December 18, 2020                           s/ Eric C. Tostrud
                                                                     Eric C. Tostrud
                                                                     United States District Court

---

title "is properly to be considered in determining legislative intent[.]" *Hovet v. City of Bagley*, 325 N.W.2d 813, 814–15 (Minn. 1982) (quoting *Cleveland v. Rice Cnty.*, 56 N.W.2d 641, 644 (Minn. 1952)). As with the statute's policy statement and purpose, however, the statute's title does not justify an interpretation that overrides the statute's textual limitations and other considerations leading to the conclusion that the parent-liability statutes do not reach limited liability companies.