UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Pitman Farms, | File No. 19-cv-3040 (ECT/LIB) |
| Plaintiff and Counter-Defendant, | |
| v. | **OPINION AND ORDER** |
| Kuehl Poultry LLC, Rodney Boser, Dan Schlichting, John Tschida, Chris Uhlenkamp, and David Welle, | |
| Defendants and Counter-Claimants. | |

Archana Nath, Natalie I. Uhlemann, and Paul William Fling, Fox Rothschild LLP, Minneapolis, MN, and Asher Shepley Anderson, Anderson Yazdi Hwang Minton & Horn, Burlingame, CA, for Plaintiff and Counter-Defendant Pitman Farms.

Jack Y. Perry, Maren M. Forde, and Andrew Stephen Dosdall, Taft Stettinius & Hollister LLP, Minneapolis, MN, for Defendants and Counter-Claimants Kuehl Poultry LLC, Rodney Boser, Dan Schlichting, John Tschida, Chris Uhlenkamp, and David Welle.

Minnesota statutes and a rule promulgated by the Minnesota Department of Agriculture establish parent-organization liability for a subsidiary's unmet obligations under specific kinds of agricultural contracts. Minn. Stat. § 17.93, subdiv. 2; Minn. Stat. § 27.133; Minn. R. 1572.0040. In other words, when they apply, these authorities override the general rule that a parent business organization is not liable merely by its status as a parent for the debts of its subsidiary.

The primary issue in this case is whether these authorities apply to chicken-production contracts between Defendants, who are Minnesota chicken growers

(and who will be referred to collectively as "the Growers"), and Simply Essentials, LLC, a chicken processor.   If these authorities govern the Growers' contracts with Simply Essentials, then Plaintiff Pitman Farms, a California corporation that is Simply Essentials' sole member, is liable to the Growers for Simply Essentials' breaches of the contracts.

Pitman Farms brought this case under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaration that the Minnesota agricultural parent-liability authorities do not govern the Growers' contracts with Simply Essentials.  Pitman Farms argues that the parent-liability authorities do not apply by their own terms, that Delaware law applies regardless, and that applying the Minnesota parent-liability authorities to trigger its liability to the Growers would violate the federal dormant Commerce Clause doctrine.  In a counterclaim also brought under the Declaratory Judgment Act, the Growers seek essentially contrary declarations and damages.

This is the case's second trip through this Court.  Three orders were issued during the case's first trip: (1) an order denying the Growers' motion to dismiss for lack of subject-matter jurisdiction or, alternatively, to abstain from adjudicating the case, *Pitman Farms v. Kuehl Poultry LLC*, No. 19-cv-3040, 2020 WL 2490048 (D. Minn. May 14, 2020); (2) an order granting Pitman Farms' motion to exclude an expert-witness declaration filed by the Growers, *Pitman Farms v. Kuehl Poultry LLC*, 508 F. Supp. 3d 465, 470–473, 486 (D. Minn. 2020); and (3) an order entering summary judgment for Pitman Farms on the sole ground that Minnesota's parent-liability authorities do not apply to the Growers' contracts with Simply Essentials because these authorities by their own terms do not apply to the parent organization of a limited-liability company (or "LLC"),

*id.*, 508 F. Supp. 3d at 473–486.  The Growers appealed only the third order, and the Eighth Circuit reversed.  *Pitman Farms v. Kuehl Poultry LLC*, 48 F.4th 866 (8th Cir. 2022).  It determined "that the use of the phrase 'corporation, partnership, or association' in the relevant statutes and rule is intended to include LLCs for the purpose of parent-company liability," and remanded the case for further proceedings, including adjudication of the issues that were not decided when the case was here the first time.  *Id.* at 884.  This order presumes familiarity with these prior decisions.

The Eighth Circuit's reversal and remand leaves essentially five issues to be decided before the case goes any further: (1) whether a Minnesota choice-of-law clause in the Growers' contracts with Simply Essentials binds Pitman Farms; (2) if the Minnesota choice-of-law clause in those contracts binds Pitman Farms, then whether the clause by its own terms applies to this case; (3) whether Minnesota's parent-liability authorities apply to parents of foreign LLCs, like Simply Essentials; (4) if Minnesota's parent-liability authorities apply to Pitman Farms, then whether a conflict between Minnesota and Delaware law exists that should be resolved in favor of applying Minnesota or Delaware law; and (5) if a conflicts-of-laws analysis leads to the application of Minnesota's parent-liability authorities, then whether those authorities violate the dormant Commerce Clause doctrine.  Pitman Farms and the Growers agree that each of these issues appropriately may be decided via summary judgment, and the record gives no reason to doubt the Parties' agreement in this regard.

The resolution of these issues is not one-sided but ultimately favors the Growers.  Minnesota's parent-liability authorities do not apply in this case by virtue of the Minnesota

choice-of-law clause in the Growers' contracts with Simply Essentials.  Regardless, under Minnesota law, these authorities apply even to foreign LLCs, and Minnesota's choice-influencing factors favor applying these authorities here.  Minnesota's parent-liability authorities do not violate the dormant Commerce Clause doctrine.

I[1]

The record facts relevant to the first question—whether a Minnesota choice-of-law clause in the Growers' contracts with Simply Essentials binds Pitman Farms—are few and undisputed.  The Growers each entered into a contract labeled a "Broiler Production Agreement" with Prairie's Best Farms, Inc. in 2017.  ECF No. 60-1 (Exs. A1–A7).  Each of these contracts includes a clause reading as follows:

14. **<u>GOVERNING LAW</u>**.

The parties agree that this Agreement is made in the State of and shall be governed by and construed in accordance with the laws *of the State of the location of the Property*.  Any dispute arising here from shall be subject to the jurisdiction of and be venued in the County in which the Property is located.  To the extent required by law, Grower has the right to request

---

[1]    The five remaining issues are decided in accordance with the familiar summary-judgment rules.  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit" under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  Courts take a slightly modified approach where, as here, there are cross-motions for summary judgment.  *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).  When considering Pitman Farms' motion, the record must be viewed in the light most favorable to the Growers, and when considering the Growers' motion, the record must be viewed in the light most favorable to Pitman Farms.  *See id.*

4

> mediation of any dispute arising from this Agreement provided that such mediation shall not delay or limit the right of any party to seek injunctive or other equitable relief for breaches of this Agreement.

ECF No. 60-1 Ex. A1 at 10,[2] Ex. A2 at 23, Ex. A3 at 35, Ex. A4 at 48, Ex. A5 at 60, Ex. A6 at 72, Ex. A7 at 84 (emphasis added in each).[3]  Though none of the contracts explicitly defines the capitalized term "Property," Pitman Farms and the Growers seem to agree that the term refers to the broiler chickens Prairie's Best supplied to the Growers and that the "State of the location of the" broiler chickens was Minnesota.  *See* ECF No. 58 at 19; ECF No. 51 at 10.  Simply Essentials assumed these contracts when it purchased the assets of Prairie's Best on November 10, 2017.  *See* ECF No. 60-2 at 6–7 (defining "Assets" to include "Existing Grower Contracts"); *id.* at 8 (defining "Existing Grower Contracts" as those contracts "set forth on Schedule 3.7"); *id.* at 39 (listing growers and referencing all Defendants/Growers).[4]  Pitman was not a party to the contracts between the Growers and Prairie's Best or to the asset purchase agreement between Prairie's Best and Simply Essentials.  *See* ECF Nos. 60-1 and 60-2.  Pitman Farms became Simply Essentials' sole member "on or around November 13, 2017."  ECF No. 59 ¶ 2.

---

[2]      Page cites are to ECF pagination appearing in the cited document's upper right corner, not to the document's original pagination.

[3]      The "Governing Law" provision is quoted in its entirety for the sake of completeness.  Neither venue nor the Growers' mediation rights remain disputed.

[4]      It doesn't seem to matter, but the schedule listing the Growers is labeled "Schedule 3.11," not "Schedule 3.7" as the Asset Purchase Agreement indicated.

The Growers acknowledge that Pitman Farms was not a party to their contracts with Prairie's Best/Simply Essentials but argue that Pitman Farms is nonetheless bound by the choice-of-law clause in those contracts because it is closely related to the disputes arising out of the contracts (*i.e.*, Simply Essentials' non-payment).  To support this argument, the Growers rely on federal and Minnesota cases applying the so-called "closely related" doctrine.  Pitman Farms argues that, for several legal and factual reasons, the closely related doctrine recognized in federal and Minnesota cases does not apply to bind it to the contracts' choice-of-law clause.  Pitman Farms does not argue that the law of a state other than Minnesota's should be applied to answer this question.

The general rule is that "the rights of a third party cannot ordinarily be 'adversely varied by an agreement to which he is not a party or by which he is not otherwise bound.'" *United Prairie Bank v. Galva Holstein Ag, L.L.C.*, No. A13–0009, 2013 WL 6223416, at *5 (Minn. Ct. App. Dec. 2, 2013) (quoting *Herington Livestock Auction Co. v. Verschoor*, 179 N.W.2d 491, 494 (Iowa 1970)).  And generally, "[a] corporate parent is a separate legal entity from any subsidiaries, even if they are wholly-owned by the parent." *Minn. Supply Co. v. Mitsubishi Caterpillar Forklift Am. Inc.*, 822 F. Supp. 2d 896, 904 (D. Minn. 2011) (citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)).

The closely related doctrine is an exception to these general rules.  Under the doctrine as applied by federal courts and Minnesota courts, a non-party to a contract may be bound by the contract's forum-selection clause when the non-party is "'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Marano Enters. of Kan. v. Z-Teca Rests., L.P.*, 254 F.3d 753, 757 (8th Cir. 2001) (quoting *Hugel v. Corp. of*

*Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993)); *see also C.H. Robinson Worldwide, Inc. v. FLS Transp., Inc.*, 772 N.W.2d 528, 535 (Minn. Ct. App. 2009).

"Foreseeability" can be a fuzzy concept, but cases applying the closely related doctrine show that federal and Minnesota courts evaluate several factual, often context-specific considerations to determine whether a non-party should have foreseen that it would be bound.  These include, for example: (1) Whether the contract was signed by an owner, officer, or some other authorized representative of the non-signatory business organization.  *ARP Wave, LLC v. Salpeter*, 364 F. Supp. 3d 990, 995 (D. Minn. 2019).  (2) Whether the contract conferred rights, benefits, or obligations on the non-party.  *See id.* (3) Whether the non-party was involved in the suit-provoking conduct or induced the contract's breach.  *See id.*; *see also Medtronic, Inc v. Endologix, Inc.*, 530 F. Supp. 2d 1054, 1056–57 (D. Minn. 2008); *Fair Isaac Corp. v. Gordon*, No. A16-0274, 2016 WL 7439084, at \*2 (Minn. Ct. App. Dec. 27, 2016).  (4) Whether the non-signatory's interests are so closely aligned with the signatory's that they are represented by the same counsel in the case.  *Endologix*, 530 F. Supp. 2d at 1057.  (5) Whether other evidence shows that the non-party was aware of the contract's forum-selection or choice-of-law clause.  *FLS Transp.*, 772 N.W.2d at 535.  (6) Whether a finding of non-foreseeability would create perverse incentives or render the law toothless.  *ARP Wave*, 364 F. Supp. 3d at 996.[5]

Applied to the record here, these considerations show that Pitman Farms was not so closely related to the Growers' contractual dispute with Simply Essentials such that Pitman

---

[5]    This list is not intended to be exhaustive.  Because the inquiry is fact-specific, it seems possible to imagine other considerations—perhaps many—that might be relevant.

Farms should have foreseen being bound by the contracts' choice-of-law clause. No Pitman Farms representative signed the contracts. The contract itself conferred no rights, benefits, or obligations on Pitman Farms. Pitman Farms was not involved in the underlying claims between the Growers and Simply Essentials. The Growers do not allege, for example, that Pitman Farms procured Simply Essentials' breach of its contracts with the Growers, and the record contains no evidence showing that Pitman Farms had anything to do with Simply Essentials' alleged non-payment. The Growers ground Pitman Farms' liability for Simply Essentials' debts solely on the parent-liability statutes. Simply Essentials has not been a party to this case, and if it becomes a party, the Growers confirm that it will not be represented by counsel, much more share counsel with Pitman Farms. ECF No. 125 ¶ 3. The Growers do not allege that Pitman Farms was aware specifically of the contracts' choice-of-law clause, and nothing in the record shows it was. Nor do the Growers identify a perverse incentive or adverse legal consequence that might follow from deciding this issue in Pitman Farms' favor.[6]

---

[6]     Pitman Farms advances several purely legal arguments against applying the closely related doctrine. Pitman Farms argues that the doctrine is limited to cases involving "tortious interference with employment contracts, where the third party that is bound was aware of the terms of the employee's agreement with a competitor." ECF No. 58 at 20. It argues that the "doctrine is not meant to be used offensively. Rather, it is meant to prevent a third party seeking to litigate its own interests pursuant to a contract from simultaneously avoiding the terms of that contract." *Id.* at 21. And it argues that the doctrine is confined to the enforcement of forum-selection clauses. *Id.* at 22. Whatever the merits of these legal points, it is not necessary to consider them because the factual considerations applied above do the work. These factual considerations show beyond any genuine issue of material fact that the closely related doctrine does not bind Pitman Farms to the choice-of-law clause in the Growers' contracts with Simply Essentials.

Against these considerations, the Growers' arguments for applying the closely related doctrine are not persuasive. The Growers argue that Pitman Farms should have foreseen being bound to the contracts in light of Minnesota's parent-liability authorities. ECF No. 51 at 11–12. That would put the cart before the horse. Whether Minnesota's parent-liability authorities govern the Growers' contracts with Simply Essentials is the ultimate issue. The first step in answering that question is deciding whether Minnesota or Delaware law governs Pitman Farms' liability for Simply Essentials' debts. The Growers do not explain how Minnesota's parent-liability authorities alone answer that choice-of-law question. For comparison's sake, it might have been different had the Growers alleged a traditional veil-piercing theory. In that hypothetical circumstance, the Growers might have introduced evidence tending to show that Pitman Farms and Simply Essentials should be treated as one, and it might have made sense to bind Pitman Farms to the Growers/Simply Essentials contracts. But the Growers do not allege a traditional veil-piercing theory. Their claims are based entirely on Minnesota's parent-liability authorities, and those authorities depend only on the presence of a parent-subsidiary relationship. The mere presence of that relationship is not enough to justify application of the closely related doctrine.[7] The Growers next argue that Pitman Farms' registration to do business in

---

[7]     In their opening brief, the Growers pointed in the direction of a traditional veil-piercing theory when they asserted that Pitman Farms "managed" and "controlled" Simply Essentials' termination of the Grower contracts. ECF No. 51 at 14. But the evidence the Growers cite to support this assertion does not. The Growers first cite allegations in their state-court complaint. *Id.* The Growers next cite a brief the Growers filed in state court. *Id.* at 15. It is difficult to understand how allegations in a complaint and arguments in a brief might be summary-judgment-worthy evidence.

Minnesota shows that Pitman Farms foresaw being bound by the Growers' contracts with Simply Essentials. It is not clear why this is so. Regardless, the record contains uncontroverted evidence establishing that Pitman Farms' Minnesota registration was not related in any way to the Growers or Simply Essentials. ECF No. 23 ¶ 3. The Growers also assert that Pitman Farms sided with Simply Essentials in the related state-court case. *See Pitman Farms*, 2020 WL 2490048, at *2 (describing related state-court case). Assuming this is true, the Growers cite no authority supporting the application of the closely related doctrine based just on the fact that litigants agree or side with each other on factual or legal issues in the same suit. The "closely related" cases require more, applying the doctrine where the non-signatory's interests are so closely aligned with the signatory's that they are represented by the same counsel. *See Endologix*, 530 F. Supp. 2d at 1057. Here, the publicly available docket from the related state-court case shows that Simply Essentials was represented by different counsel from Pitman Farms. *Boser v. Prairie's Best Farms, Inc.*, No. 49-cv-19-1751 (Morrison Cnty., Minn.).

*

Pitman Farms is not bound to the choice-of-law clause in the Growers' contracts with Simply Essentials by virtue of the closely related doctrine, meaning Minnesota law does not apply to this case on that basis.

## II

Were Pitman Farms bound to the choice-of-law clause in the Growers' contracts with Simply Essentials, I would conclude that the clause by its own terms would not govern the Growers' claims against Pitman Farms under Minnesota's parent-liability authorities.

To recap, as relevant to this issue the clause says that "this Agreement . . . shall be governed by and construed in accordance with the laws of [Minnesota]."  ECF No. 60-1 Ex. A1 at 10, Ex. A2 at 23, Ex. A3 at 35, Ex. A4 at 48, Ex. A5 at 60, Ex. A6 at 72, Ex. A7 at 84.

When faced with a choice-of-law question, "[a] federal court sitting in diversity ordinarily must follow the choice-of-law rules of the [s]tate in which it sits." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 65 (2013).  Under Minnesota law, courts generally enforce contractual choice-of-law provisions, subject to two limitations.  *See St. Jude Med. S.C., Inc. v. Suchomel*, No. 19-cv-2400 (JRT/BRT), 2020 WL 1853653, at *5 (D. Minn. Apr. 13, 2020).  First, as a matter of Minnesota law, the parties must have "acted in good faith and without an intent to evade the law." *St. Jude Med. S.C., Inc. v. Biosense Webster, Inc.*, 818 F.3d 785, 788 (8th Cir. 2016) (citation and alterations omitted).  Pitman Farms does not argue that there was any bad faith or intent to evade the law here.  Second, as a matter of federal constitutional law, the state chosen must have a "significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313 (1981).  Again, Pitman Farms does not challenge the choice-of-law clause on this ground, and this makes sense in view of the Growers' presence and operations in Minnesota and the fact that the Growers/Simply Essentials' contracts contemplated performance of many, if not most, of the contracts' obligations in Minnesota.

"In some circumstances, choice of law clauses can control which jurisdiction's law will govern statutory or tort claims in addition to breach of contract claims arising out of the agreements of which the clauses are a part." *Khoday v. Symantec Corp.*, No. 11-cv-

180 (JRT/TNL), 2014 WL 1281600, at *18 (D. Minn. Mar. 13, 2014) (alteration omitted) (quoting *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1031–32 (D. Minn. 2013)).    Whether a choice-of-law clause governs a non-contractual claim is a context-specific question that depends on both the language of the clause and the nature of the claim asserted.    For example, the Eighth Circuit has held that a clause providing that an agreement would "be governed by and interpreted in accordance with" Minnesota law applied to a plaintiff's claims for negligent performance, misrepresentation, deceptive trade practices, and unjust enrichment. *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1392 (8th Cir. 1997); *see also Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1061 (8th Cir. 2003); *Nat'l Agri-Services, Inc. v. AGCO Corp.*, No. 04-cv-4530 (JMR/FLN), 2006 WL 8445121, at *2–3 (D. Minn. Feb. 15, 2006).    When a choice-of-law provision contains narrower language—for example, saying that the chosen law governs only the "interpretation" of the contract—it may not extend to non-contractual claims. *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 930 (8th Cir. 1999) (applying Arkansas law).    If the language is broad enough to implicate non-contractual claims, then the chosen law will apply to those claims if they are "'closely related' to the terms of the contract, such that the [c]ourt would need to interpret the contract in order to resolve the . . . claim.'" *Warren E. Johnson Cos. v. Unified Brand, Inc.*, 735 F. Supp. 2d 1099, 1105 (D. Minn. 2010) (adopting report and recommendation); *cf. Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687–88 (8th Cir. 2001) (concluding that a choice-of-law provision did not apply to a fraudulent-concealment claim that "arose out of the circumstances surrounding the formation of the contract").

Under these authorities, if the closely related doctrine bound Pitman Farms to the choice-of-law clause in the Growers/Simply Essentials contracts, the clause by its terms would not apply to the Growers' claims under Minnesota's parent-liability authorities. Pitman Farms' liability in this case depends on two distinct determinations: first, that Simply Essentials breached its contracts with the Growers, and second, that Pitman Farms is liable for Simply Essentials' breaches under Minnesota's parent-liability authorities. Pitman Farms denies that Simply Essentials breached its contracts with the Growers, *compare* ECF No. 40 ¶ 17 *with* ECF No. 42 ¶ 17, meaning at least at this stage that the contract question remains disputed. *See also In re: Simply Essentials, LLC*, No. 20-00305, ECF No. 557 at 2 (Bankr. N.D. Iowa Jan. 25, 2023). There is no question that, under the contracts' choice-of-law clause, Minnesota law applies to resolving that dispute. But Pitman Farms' liability beyond that has nothing to do with the contract. Once Simply Essentials' liability to the Growers is established, Pitman Farms' liability to the Growers—as the Growers' counterclaim makes clear—depends entirely on whether Minnesota's parent-liability authorities apply to Pitman Farms. Answering that question requires construing those authorities and applying them to the facts concerning the relationship between Pitman Farms and Simply Essentials. It does not require examining or interpreting the Growers/Simply Essentials contracts.

*

Were Pitman Farms bound to the choice-of-law clause in the Growers' contracts with Simply Essentials, the clause by its own terms would not govern the Growers' claims against Pitman Farms under Minnesota's parent-liability authorities.

### III

Relying on a Minnesota statute, Pitman Farms argues that Minnesota's parent-liability authorities do not apply to the parent or parents of a foreign LLC, like Simply Essentials. (Everyone acknowledges that Simply Essentials was formed under Delaware law. Pitman Farms alleged that fact in its operative Amended Complaint, ECF No. 34 ¶ 13, and the Growers admitted that fact in their Answer, ECF No. 40 ¶ 14.) The statute on which Pitman Farms relies reads, in relevant part:

> The law of the state or other jurisdiction under which a foreign limited liability company is formed governs: . . . (2) the liability of a member as member, a manager as manager, and a governor as governor for the debts, obligations, or other liabilities of the company.

Minn. Stat. § 322C.0801, subdiv. 1. In Pitman Farms' view, Minnesota's parent-liability authorities, if applied here, would impose liability on Pitman Farms solely because of its role "as member" of Simply Essentials. Pitman Farms understands § 322C.0801 to say that only Delaware law could govern the parent-liability question. Delaware has no comparable parent-liability authorities.

Minnesota's parent-liability authorities do not govern "the liability of a member as member" as that phrase is intended in § 322C.0801. In Minnesota, an LLC's members enjoy a liability shield: "The debts, obligations, or other liabilities of a limited liability

14

company, whether arising in contract, tort, or otherwise: (1) are solely the debts, obligations, or other liabilities of the company; and (2) do not become the debts, obligations, or other liabilities of a member, manager, or governor solely by reason of the member acting as a member, manager acting as a manager, or governor acting as a governor." Minn. Stat. § 322C.0304, subdiv. 1; *see Fed. Nat'l Mortg. Ass'n v. Grossman*, No. 12-cv-2953 (SRN/JJG), 2014 WL 4055371, at *1 n.1 (D. Minn. Aug. 15, 2014) (describing LLCs). An LLC's members, in other words, are not liable for the LLC's debts and obligations merely by virtue of their status as members.

Notwithstanding the status-as-member liability shield, an LLC's members may face liability arising from various roles they occupy within the LLC. This is true at common law. *See, e.g.*, *Jones v. Lancaster Lumber, Inc.*, No. 4:20-cv-00259-SBJ, 2021 WL 6618709, at *6–9 (S.D. Iowa Mar. 5, 2021). And statutes impose liability arising from delineated roles an LLC's members may assume. *See, e.g.*, Minn. Stat. § 268.063.

Minnesota's parent-liability authorities impose liability on an LLC's members' roles as parents, not merely the members' status as members. The implementing regulation for Minn. Stat. § 17.93 confirms this distinction by narrowing the universe of an LLC's members who would have parent liability. Minn. R. 1572.0040. The point is that, generally speaking, liability assumed through the role of a parent and liability by mere status as a member are different things. *See* 1 Carter G. Bishop and Daniel S. Kleinberger, *Bishop and Kleinberger on Limited Liability Companies* § 6:80 (2022). It is true that Pitman Farms' status as the only member of Simply Essentials makes it more difficult here factually to distinguish between Pitman Farms' status as member and role as parent. The

status/role legal distinction nonetheless holds, and no authority has been cited suggesting that the status/role legal distinction cannot properly be made in a case involving a single-member LLC.

*

Minnesota's parent-liability authorities do not govern "the liability of a member as member" as that phrase is intended in § 322C.0801, meaning § 322C.0801 does not require Delaware law to govern Pitman Farms' obligations, if any, to the Growers under the Growers' contracts with Simply Essentials.

IV

The next question is whether Minnesota or Delaware law governs the Growers' claims against Pitman Farms under conflicts-of-laws principles.  In this diversity case, Minnesota's choice-of-law principles must be applied to answer this question.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Highwoods Props., Inc. v. Exec. Risk Indem., Inc.*, 407 F.3d 917, 920 (8th Cir. 2005).  Though Minnesota courts follow a three-step process to answer choice-of-law questions, the analysis here can proceed quickly to the third step.  There is an actual conflict between Minnesota and Delaware law because Delaware imposes no parent-company liability.  *See Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn. 1994) ("[T]he first consideration is whether the choice of one state's law over another's creates an actual conflict.").  And no one questions "whether the law of both states can be constitutionally applied" in view of the state-interest-creating contacts Minnesota and Delaware each have to the dispute.  *Id*. at 469–70.

16

At the third step, Minnesota courts apply five "choice influencing factors" to determine which state's law should apply: "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." *Id*. at 470 (citing *Milkovich v. Saari*, 203 N.W.2d 408, 412 (1973)).   On balance, these choice-influencing factors favor the application of Minnesota law.

The predictability-of-results factor does not favor applying Minnesota or Delaware law.   "Predictability of results applies primarily to consensual transactions where the parties desire advance notice of which state law will govern in future disputes." *Myers v. Gov't Emps. Ins. Co*., 225 N.W.2d 238, 242 (1974).   "The objective of the predictability factor is to fulfill the parties' justified expectations." *Lommen v. City of E. Grand Forks*, 522 N.W.2d 148, 150 (Minn. Ct. App. 1994).   It is true that, by assenting to the chicken-production contracts and the contracts' Minnesota choice-of-law clause, the Growers and Simply Essentials engaged in consensual transactions and shared justified expectations that Minnesota law would apply to resolve their disputes.  The Growers and Pitman Farms, on the other hand, engaged in no consensual transactions, and nothing about their relationship suggests they ever had a shared understanding or advance notice of what law might govern their disputes.   The factor, in other words, seems a poor fit for the Growers' non-contractual, non-consensual interactions with Pitman Farms.

The maintenance-of-interstate-order factor favors applying Minnesota law.   This factor concerns "whether the application of Minnesota law would manifest disrespect for [Delaware's] sovereignty or impede the interstate movement of people and goods."

*Jepson*, 513 N.W.2d at 471.  The primary focus is on the contacts that each competing state has with the dispute.  "[W]here a state 'has little or no contact with a case and nearly all of the significant contacts are with a sister state, the factor suggests that a state should not apply its own law to the dispute.'"  *Burks v. Abbott Lab'ys.*, 639 F. Supp. 2d 1006, 1013 (D. Minn. 2009) (quoting *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 620–21 (8th Cir. 2001)); *accord Johnson v. Parrish Tire Co.*, No. 06-cv-2267 (MJD/SRN), 2009 WL 10677525, at *5 (D. Minn. Mar. 30, 2009) ("[M]aintenance of interstate order weighs in favor of the state that has the most significant contacts with the facts relevant to the litigation.").  Minnesota's dispute-related contacts are substantial.  The Growers are all here.  And the Growers and Prairie's Best/Simply Essentials contemplated that chicken-production activities under the contracts would be carried out in Minnesota.  Though some contract-related activities occurred outside Minnesota, there is no record evidence suggesting any contract-related activities occurred in Delaware.   Delaware's only connection is that Simply Essentials was organized under Delaware law.  That connection is quite minimal in comparison to the case's Minnesota connections, meaning it would be a mistake to rely on just that connection to apply Delaware law.

The simplification-of-the-judicial-task "factor concerns the forum court's ability to discern and apply the law of another state as compared to its own law." *Lommen*, 522 N.W.2d at 152.  It "largely focuses on the necessity of allowing the forum state to apply its own procedural law." *Id.*  Here, this factor seems neutral and comparatively unimportant.  It is neutral because, though the case has presented its share of discernment- and application-related challenges, these challenges have concerned Minnesota law, not

Delaware law.  In other words, if the primary focus of the factor concerns complexities posed by another state's law, we don't have that.  What is more, the complexities unique to Minnesota's parent-liability authorities have been resolved.  The Eighth Circuit resolved whether the parent-liability authorities apply to LLCs.  And the question of whether the parent-liability authorities apply to the parent or parents of a foreign LLC was answered in the preceding section.  The factor is comparatively unimportant because it "has not been given much weight in" Minnesota Supreme Court precedents.  *Nodak Mut. Ins. Co. v. Am. Fam. Mut. Ins. Co.*, 604 N.W.2d 91, 95 (Minn. 2000).[8]

The governmental-interest factor favors applying Minnesota law.  This factor asks "which choice of law most advances a significant interest of the forum."  *Nodak Mut. Ins. Co.*, 604 N.W.2d at 95 (citation omitted).  "It 'requires analysis not only of Minnesota's governmental interest, but also of [Delaware's] public policy.'"  *Murray v. Cirrus Design Corp.*, No. 18-cv-02510 (NEB/LIB), 2019 WL 1086345, at *3 (D. Minn. Mar. 7, 2019) (quoting *Blake Marine Grp. v. CarVal Invs. LLC*, 829 F.3d 592, 596 (8th Cir. 2016)); *see also Lommen*, 522 N.W.2d at 152 (considering "the relative policy interests of the two states").  "When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, . . . clearly the law of the interested state should be applied."  *Nodak Mut. Ins. Co. v. Am. Fam. Mut. Ins. Co.*, 590 N.W.2d 670, 674 (Minn. Ct. App. 1999) (citation omitted).  As the Eighth Circuit's recounting of their

---

[8]    Courts applying the interstate-order factor also consider whether there is evidence of forum shopping. *See Jepson*, 513 N.W.2d at 471.  There is no indication of forum shopping here, at least as between Minnesota and Delaware.  Both Pitman Farms and the Growers filed suit in Minnesota.

purpose demonstrates, the parent-liability authorities served Minnesota's significant interest in "the protection of producers" and "the prohibition of specific trade practices." *Pitman Farms*, 48 F.4th at 872 (quotation omitted); *see also id.* at 870–74 (describing legislative background).  These policies mattered to the Eighth Circuit's decision.  *See id.* at 883–884.  The court noted specifically that "the legislature clearly expressed its intent to protect producers of agricultural commodities from economic harm due to parent business entities using their organizational form to avoid liability for their subsidiaries' actions."  *Id.* at 884.  If Delaware has a specific, significant contrary interest, it has not been identified.

The fifth factor, the "better rule of law," does not apply at all when a court can resolve a choice-of-law question using the other four factors, and in any event, it is less significant when the conflict at issue involves state statutes, as opposed to common law.  *See Whitney v. Guys, Inc.*, 700 F.3d 1118, 1124 (8th Cir. 2012) (addressing competing statutes of limitations and noting that "[l]egislatures rather than courts are best positioned to assess the comparative merits of the competing policy concerns" involved).

*

Minnesota's choice-of-law principles favor applying Minnesota law to resolve the Growers' claims against Pitman Farms.

V

Pitman Farms argues that Minnesota's parent-liability authorities violate the dormant Commerce Clause doctrine.  For purposes of this argument, the applicable law may be summarized succinctly.  "[T]he Commerce Clause not only vests Congress with

20

the power to regulate interstate trade; the Clause also 'contain[s] a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. ---, 143 S. Ct. 1142, 1152 (2023) (quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)). "[T]he Commerce Clause prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 1153 (cleaned up). "[T]his antidiscrimination principle lies at the 'very core' of [the Supreme Court's] dormant Commerce Clause jurisprudence." *Id.* (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)). A state law does not violate the Commerce Clause merely because it may "have the 'practical effect of controlling' extraterritorial behavior." *Id.* at 1156. A state "law's practical effects may . . . disclose the presence of a discriminatory purpose." *Id.* at 1157; *see Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981). To show that a law's practical effects disclose a discriminatory purpose, a plaintiff must begin by "showing that a challenged law imposes 'substantial burdens' on interstate commerce *before* a court may assess the law's competing benefits or weigh the two sides against each other." *Nat'l Pork Producers*, 143 S. Ct. at 1161. Pitman Farms does not show how Minnesota violated these rules in adopting the parent liability authorities.

Pitman Farms does not explain how the parent liability authorities benefit Minnesota's economic interests by burdening out-of-state competitors. It is true that

Minnesota's parent liability authorities protect those who produce agricultural commodities in Minnesota from non-payment in a way that other states may not.  But it does not follow that this regime burdens producers in states other than Minnesota.  In this situation, Minnesota seems indistinguishable from states that, for example, tax or regulate a given industry less than others.  Those commonplace distinctions do not ordinarily implicate dormant Commerce Clause principles.

Nor does Pitman Farms show how Minnesota's parent liability authorities substantially burden interstate commerce.  Pitman Farms compares this case to *Styczinski v. Arnold*, 46 F.4th 907 (8th Cir. 2022), and other cases involving extraterritorial regulation.  In *Styczinski*, a collection of in-state and out-of-state precious metal traders or representatives challenged the constitutionality of a Minnesota statute, Minn. Stat. § 80G, that regulated bullion transactions.  *Id*. at 909.  The Eighth Circuit found that the statute's regulation of "Minnesota Transactions"—defined broadly to include transactions between a foreign dealer or representative and a Minnesota consumer no matter where the transaction occurred—violated the dormant Commerce Clause doctrine.  *Id*. at 910.  The statute made it unlawful for "dealers" to conduct a "Minnesota Transaction" without being registered by the Minnesota Commissioner of Commerce.  *Id*. at 910–11 (citing Minn. Stat. § 80G.02, subdiv. 1).  The statute specified that anyone who conducted bullion transactions without being properly registered was guilty of a misdemeanor.  *Id*. at 911.  And the statute granted the Commissioner various civil enforcement powers in the event the statute was violated, including instituting a civil action, issuing an order directing compliance, or issuing an order denying, suspending, or revoking the registration of the dealer.  *Id*.  Those

22

violating the statute faced possible civil penalties such as a permanent injunction, an asset freeze, an order for the Commissioner to take charge of the dealers' property, or a civil penalty of up to $10,000 per violation.  *Id*.  The Eighth Circuit found that the statute violated the dormant Commerce Clause doctrine because it "applie[d] Minnesota law to commerce wholly outside of Minnesota," reiterating that "no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another."  *Id*. at 913 (quoting *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 337 (1989)). Minnesota's "interest in requiring dealers to register before doing business in Minnesota," the Eighth Circuit held, "does not allow Minnesota to pin its law onto its in-state dealers and their transactions wherever they travel" because "[s]uch a scheme unconstitutionally controls wholly out-of-state commerce."  *Id*. at 914.

In contrast to the statutory regime at issue in *Styczinski*, the parent liability authorities do not control wholly out-of-state commerce.  Though it may be true that the parent itself need not conduct business in Minnesota, the parent's contracting subsidiary must.  Minn. Stat. § 17.90, subdiv. 3.  Pitman Farms does not explain how the parent liability authorities might regulate commerce "wholly outside of Minnesota," *Styczinski*, 46 F.4th at 913, or how the mere potential for an out-of-state financial liability might violate dormant Commerce Clause principles.  Really, Pitman Farms' complaint seems to be that Minnesota's parent liability authorities cause it to face additional risks (and perhaps costs) if its subsidiary contracts with a producer of agricultural commodities in Minnesota (and defaults).  The same might be said of innumerable state laws.  On this record, it is difficult to understand how that is a Commerce Clause problem.

*

Minnesota's parent liability authorities do not violate the dormant Commerce Clause doctrine.

## VI

Where this case goes from here is not obvious.  To answer that question, the Parties will be directed to contact chambers to schedule a follow-up conference pursuant to Fed. R. Civ. P. 16.  The Parties will not be required to file a report or any other paper in advance of the conference.

In anticipation of that conference, and to promote the efficient resolution of this action, the Parties are advised of the following: (A) As I understand it, this order disposes of all claims asserted in Pitman Farms' operative amended complaint [ECF No. 34], and the Growers' operative counterclaim [ECF No. 40], but only to the extent the Growers sought merely contrary declarations.  (B) If that is correct, then the Growers' claims for damages or monetary relief against Pitman Farms remain to be adjudicated.  (C) In view of the Morrison County District Court's stay order and my familiarity with the case, it makes good practical sense to allow the Growers to litigate their claims for damages or monetary relief in this court.  (D) To that end, it also seems sensible to allow the Growers to amend their operative counterclaim to enable them to plead these claims.

The Growers' motion for leave to amend [ECF No. 116] in its current form will nonetheless be denied.  Though a district court should "freely" give leave to amend "when justice so requires," Fed. R. Civ. P. 15(a)(2), the Growers' proposed amendments are problematic in several respects.  The proposed amendments include the addition of

24

substantial affirmative defenses to claims that have been dismissed.  It is not clear whether or how these allegations relate to the Growers' claims.  The Growers seek to join Simply Essentials as a "nominal" party that would be unrepresented on the theory that it may be a required party under Fed. R. Civ. P. 19(a).  This justification contradicts an order entered earlier in this case.  *See Pitman Farms*, 2020 WL 2490048, at *3–4.  The Growers neither address the prior order nor explain the contradiction.  And Simply Essentials is in bankruptcy.  Though the Bankruptcy Court ordered the stay lifted so that Simply Essentials could be added as a nominal party in this case, it is difficult to see how the Growers' proposed amendments would not require much more of Simply Essentials.  Finally, the proposed amendments include lengthy quotations from statutes, regulations, and other materials that seem both unnecessary in view of the summary-judgment order and at least inconsistent with Fed. R. Civ. P. 8(a)(1).

## ORDER

For these reasons, and all of the files, records, and proceedings , **IT IS ORDERED THAT:**

1.     Plaintiff's Motion for Summary Judgment [ECF No. 56] is **DENIED.**

2.     Defendants' Motion for Summary Judgment [ECF No. 49] is **GRANTED.**

3.     Defendants' Motion for Leave to Amend [ECF No. 116] is **DENIED**.  This denial is without prejudice to Defendants' ability to seek leave to amend following the upcoming Rule 16 conference.

4.      The Parties shall contact the Court by not later than Monday, June 12, 2023, to schedule a Rule 16 conference.  The Rule 16 conference shall be scheduled to occur on or before June 27, 2023.

Dated: June 6, 2023                                s/ Eric C. Tostrud
                                                   Eric C. Tostrud
                                                   United States District Court